McHugh, J.
The impetus for this case is the Gay Head Selectmen’s November 22, 1993 reconstitution of the Gay Head Zoning Board of Appeals (“the Board”). As reconstituted, the Board did not include three long-time members. Here and in Federal Court, the three claim that their absence from the reconstituted Board stems from the Selectmen’s disagreement with conditions the three had imposed on their approval of an application for a comprehensive permit filed by a local housing authority under G.L. c. 40C, §23.
After the events of November 22, the three former Board members commenced an action in the United States District Court for the District of Massachusetts in which they raised a series of state and federal claims. Shortly thereafter, the Town commenced an action against the three in this court seeking declaratory relief.
The three then counterclaimed and asserted third-party claims against individuals other than the plaintiff town for declaratory relief and damages. As a result, the state and federal court actions now are largely mirror images of the other.
Against that procedural background, all parties agreed that this court would proceed to decide, without a jury, the question of whether the Board’s November 22, 1993 action was proper as a matter of state law with the federal consequences of the November 22 action to be decided in the federal forum at another date.[2] Accordingly, the case proceeded before the undersigned, sitting without a jury, on the limited questions of state law.
Based on the agreed issues of fact contained in the first six pages of the joint pretrial memorandum the parties submitted, the agreed upon exhibits introduced by the parties during the trial, the testimony and remaining exhibits introduced during the trial and the reasonable inferences I have drawn from all of those sources, I make the following findings of fact and conclusions of law.
FINDINGS OF FACT
The Town of Gay Head ("the Town”), Massachusetts, is located on Martha’s Vineyard and was incorporated in 1870. The Town is one of the smallest in the Commonwealth and, according to the most recent census data, has a year-round population of approximately 250.
Understanding the events of November 22, 1993, requires some understanding of the way in which the Town has dealt with the Board since the Board was created more than 20 years ago. On December 20, 1972, the Town enacted a zoning ordinance providing for a Board of Appeals consisting of five members. The Attorney General approved the ordinance early the following year. On February 26, 1973, the Selectmen appointed the initial five-person board to staggered terms that complied with c. 40A, §12 and all other requirements of law.
Almost immediately, however, the Selectmen’s appointment process began to take on the characteristics that provide a platform for the present troubles. After the initial appointments, the Selectmen made almost all subsequent appointments to the Board *329 without any apparent regard to when previous appointments expired and, in many cases, without any statement of a term for which the members would serve.
The Selectmen’s approach to the appointment process was not the product of a conscious desire to avoid, ignore or thwart the requirements of state law. Instead, their approach grew out of the Town’s small population, difficulties in recruiting sufficient volunteers to fill all Town positions that required filling, local political divisions and the fact that many statutes with which the Town was and is required to comply were enacted with towns of far larger population in mind. Throughout the years, the net effect of those forces has been a pervasive and wholesale indifference to the requirements of law insofar as the constitution and operation of some town boards is concerned.
In any event in 1978, the Town hired Diane Brady[3] as its first executive secretary and only full-time employee. Ms. Brady set about examining all aspects of Town government and quickly discovered that appointments to the Board had not been made as the law required. Upon review of Town records, she concluded that no one could make rational judgments concerning who was properly serving on the Board and who was not. As a consequence, Ms. Brady wrote to Town counsel, then Ivo Meisnor, Esq., for advice about what to do. Mr. Meisnor responded that, in order to correct the problem, the Selectmen, at their next meeting, should appoint five new members to the Board and should appoint those members to staggered terms of from one to five years each. Mr. Meisnor further recommended that two associate members be appointed for one and two-year terms respectively. Finally, Mr. Meisnor recommended that, as the term of each permanent member expired, the Selectmen appoint a replacement to a five-year term.
The Selectmen took Mr. Meisnor’s advice and, on April 3, 1979, appointed five members to the Board for staggered terms of one to five years each. The Town Report for the fiscal year ending June 30,1979 reflects those appointments.[4] The next year Patti (Young) Vanderhoop, who had been appointed to a one-year term, was reappointed to a five-year term when her term expired. The Town Report for the fiscal year ending June 30, 1980 therefore shows the Board again in full compliance with the requirements of law.
At the end of 1980, the Selectmen, then chaired by Jeffrey Madison, began to exhibit impatience with the way in which a variety of Town affairs were being carried out. As a remedy, the selectmen decided to reorganize various aspects of Town government. They did. During the reorganization, three members of the Board were replaced by two. As a consequence, as of June 30, 1981, the Board consisted of four members with staggered terms, none of which expired in 1981.[5]
In the 1982 annual Town Report, the Board which had been listed in the 1981 Town Report as an “elected” body, was described as a “standing committee” consisting of five members. Although expiration dates for the terms of other Town officers were listed in the report, no expiration dates were listed for members of the Board. In 1982, Mr. Madison served both as the chairman of the selectmen and as a member of the Board. He was responsible for changing the Board’s listing in the Town Report from an “elected” body to a “standing committee.” He and other Selectmen were unaware of the appointment and term provisions of G.L. c. 40A, §12 and were equally unaware of the then still recent reorganization of the Board Ms. Brady had facilitated.
I find and conclude, on sometimes conflicting evidence that would warrant a finding to the contrary, that the Selectmen thereafter made all appointments to the Board on an annual basis for a one-year term. Typically, the Selectmen held a meeting in May or June of each year at which they made all appointments for the following fiscal year. The Selectmen intended to make appointments to the Board for one-year terms and believed they had the right to make appointments for terms of that length. Customarily, the annual Town Report carried the names of the individuals whom the Selectmen had most recently appointed but, at least insofar as the Board was concerned, the Report was not always congruent with what other Town records suggested was the Board’s composition. Compare, e.g., Ex. 17, 18, 71. Sometimes members of the Board were formally sworn into office by the Town clerk who gave them a certificate evidencing their status and stating when their term expired. Often, however, no such ceremony occurred and no certificate was created.
The Town Report typically stated that the terms of appointed boards expired in May of the following year. Sometimes, the Selectmen did not hold their annual appointment meeting until June or July and all board members simply continued to serve under their old appointments until that meeting was held and they were, in most cases, reappointed. Indeed, unless the Selectmen had a particular concern with an individual’s service, members of all Town Boards typically were reappointed without being asked if they wished to continue to serve.
After 1982, the annual Town Report almost uniformly stated that all Board members held office for a term that expired in May ofthe following year. In practice, members of the Board were reappointed, and understood that they would be reappointed, for as long as they were interested in serving and as long as the Selectmen found no fault with their service. The Town was so hard-pressed to find individuals willing to serve on various boards that few who wished to continue serving on a board or town committee were denied an opportunity to do so.
The appointment of the three defendants occurred in the general environment just described. Elise Lebovit was first appointed to the Board on April 27, 1982. At that time, she was formally sworn in. She was sworn in again on at least one other occasion during her eleven-year tenure on the Board. I find that, *330 although she never had an explicit discussion with a member of the Selectmen concerning the duration of her appointment, Ms. Lebovit believed that all town appointments, including hers, were made on an annual basis. She also believed that, in all likelihood, she would be reappointed for as long as she was willing to serve provided that the selectmen found her service acceptable. As with other members of town boards, however, Ms. Lebovit gave the matter of her reappointment little thought because, as described earlier, re-appointments typically followed as a matter of course.
William Sargent, the second of the three defendants, was initially appointed as an alternate member of the Board in October of 1987. He was appointed as a full member in 1988. Mr. Sargent was reappointed as a full member on July 31, 1989 and was reappointed annually thereafter. But see n.6, infra.
Michael W. Stutz, the third of the three defendants, was initially appointed as an alternate member on March 6, 1989 for a term that expired in May of 1989. On May 22,1989, Mr. Stutz was appointed to a full one-year term as an alternate. That year, however, Selectmen expressed concern about Ms. Evelyn Vanderhoop’s simultaneous service on the Board and the Planning Board. Ultimately, Selectmen appointed her to the Board for a truncated term. Although she wished to continue service on both Boards, the Selectmen replaced her with Mr. Stutz at the end of her truncated term. Mr. Stutz was formally sworn in as a full member on July 31, 1989.
Selectmen made their 1990 appointments at a meeting held on June 4, 1990. At that meeting, Mr. Madison, who by then was no longer a member of the Board but remained a Selectmen, asked his fellow Selectmen to join him in declining to reappoint Mr. Stutz because Mr. Madison did not like the job Mr. Stutz was doing as a Board member. Mr. Stutz attended either the June 4 meeting or some later meeting after learning that his appointment was being contested by Mr. Madison. Ultimately, on July 9, Mr. Stutz was reappointed and continued service on the Board thereafter under one-year reappointments.
I find and conclude that Mr. Stutz, a labor arbitrator by profession, knew that town appointments, including his own, were made on an annual basis. He knew that, by and large, reappointment followed as a matter of course as long as one manifested an interest in continuing to serve or unless the selectmen had some reason for non-reappointfnent. He knew that his appointment to regular board membership resulted from the Selectmen’s focused disagreement with Ms. Vanderhoop’s continued service on both the Planning Board and the Board. He also knew that his own reappointment was in jeopardy in 1990 because of Mr. Madison’s dissatisfaction with his service. Moreover, Mr. Stutz knew, as did all other members of the Board, that the Selectmen held annual meetings at which members of all town boards were generally appointed and he knew that the annual Town Reports typically said that the terms of office of all non-elected board members expired the following year.
The foregoing folkways, customs, practices and conventions produced a Board that on January 1,1993 was composed of Ms. Lebovit and Messrs. Sargent, Michael Hebert, Stutz and Alfred Vanderhoop. Peter Ives was an alternate member.[6] None of them had been appointed to a term in a manner consistent with G.L. c. 40A, §12. Moreover, by January 1, 1993, the casual state of town records and the Selectmen’s process of appointments over the preceding 10 or 11 years made any accurate reconstruction of the proper expiration dates of the terms board members should have been occupying virtually impossible absent a series of arbitrary assumptions concerning what seat was occupied by whom.
Early in 1993, the Aquinnah Wampanoag Tribal Housing Authority (“the AWTHA") filed with the Board an application to construct a total of 30 three- and four-bedroom housing units on approximately forty-four acres of land in Gay Head.[7] The AWTHA filed the application pursuant to G.L. c. 40B, §21, which allows a
public agency or limited dividend or non-profit organization proposing to build moderate or low income housing [to] submit to the Board of Appeals ... a single application to build such housing in lieu of separate applications to the applicable local boards.
Once the application is filed, the statute requires the Board to notify all other boards that normally would have jurisdiction, to hold a hearing at which the advice of those boards is solicited and then to issue a comprehensive permit containing all conditions of all kind and description that affect the project.
The AWTHA’s proposal sparked considerable controversy in the town. The basis for that controversy was set out by the Board in the findings of fact it ultimately made when it decided the AWTHA’s application:
4.1 The Town of Gay Head was incorporated into the Commonwealth in 1870. After operating as a township for over 100 years, the descendants of the initial Native American residents of Gay Head formed the Wampanoag Tribal Council of Gay Head, Inc. (“the Tribe”) and filed an action in Federal District Court against the Town claiming title to over 200 acres of Town-owned “common” lands. The non-Indian residents of the Town, most of whom are seasonal, formed the Gay Head Taxpayers’ Association and intervened in the law suit. Settlement negotiations . . . resulted in an agreement dated November 19, 1983 . . . [calling] for the town common lands and about 175 acres of private settlement lands to be transferred to the Federal Government to be held in trust for the benefit of the Tribe. The agreement provided further that the land would not be treated as real property subject to taxation, but rather payment in lieu of taxes would be made if and when improvements were placed on the land. Such payments would be *331 based on the value of the land and improvements, and the town property tax rate was to be applied.
4.4 Gay Head is one of the smallest towns in the Commonwealth. According to a 1990 Data Report from the [Martha’s Vineyard Commission] . . . Gay Head has ayear-round population of approximately 250. Housing stock in the town as of 1986 consisted of a total of332 units, of which 171 were designated as seasonally occupied. Of the 161 units of year-round housing, 68 were designated “vacant year round,” 46 were designated renter occupied, and 47 [were] designated owner occupied.
4.5 The 1992 Town Report states that the town’s total expenditures in FY 92 were $1,021,174; the final appropriation for FY 93 was $1,103,378; and the proposed budget for FY 94 was $1,133,470
4.6 According to the 1992 Town Report, the cost of education during FY 90 and FY 94 ranged between 20% and 24% of the Town’s budget.
4.7 According to the 1992 Town Report, there are 32 in Town who are transported to other towns on the island for their education, as the Town does not have its own school. . .
4.8 Based on the 1992 Town Report, the cost to the Town per student for education is in excess of $8,000, which we are informed is the seventh highest in the State. Additional costs are reasonably anticipated because there are additions under discussion for all three schools [presently serving] the children of Gay Head.
5.3 Given the costs of education, the construction of 30 additional units of three and four bedroom family housing could have serious financial consequences to the Town and may result in the Town having to construct its own school.
5.4 The Zoning Board was informed by the Superintendent of the Schools that there is a presumption there will be 2.3 children per unit of housing, which figure is used in projecting needs of communities for schools. Applying that figure to 30 proposed units of three and four bedroom family housing, it is possible that up to 69 children could reside in the Project.
In the last analysis, the prospect of having to pay for the education of 69 additional school children, more than twice as many as the Town was then educating, was a significant concern to many of the town’s citizens.
In any event, upon receipt of the AWTHA’s application, the Board gave the appropriate notices and held the required hearing. That hearing closed on April 8, 1993. The Board then referred the AWTHA’s application to the Martha’s Vineyard Commission, the Island’s regional planning agency created by St. 1977, c. 831. On June 17, 1993, the Commission voted to approve the AWTHA’s application. The Commission’s decision of approval included the following recommendations:
The Martha’s Vineyard Commission most strongly urges both parties, the Town of Gay Head through the Board of Selectmen and the Wampanoag Tribe through the Wampanoag/Aquinnah Tribal Council to begin immediately [sic] the entire issue of payment in lieu of taxes by executing forthwith Agreement for Reimbursement of Services as cited in Public Law 100-95 — August 18, 1987 and Chapter 277 of the Acts of 1985 of the Commonwealth of Massachusetts.
The Commission’s decision was recorded by the Town Clerk in Gay Head on June 21, 1993. Four days later, the Board issued its decision. In essence, the Board concluded that unconditional allowance of the application would overburden the Town financially. Accordingly, although the Board approved the application, it conditioned its approval on (a) an even division of the thirty units between elderly and family housing, (b) phasing the project in such a way that no more than eight new emits could be occupied each year, and (c) a requirement that the Selectmen and the Tribe agree on a schedule and program of payments in lieu of taxes. The Board’s vote on the conditional approval was three to one in favor. The three voting in favor were Ms. Lebovit and Messrs. Sergeant and Stutz. Mr. Hebert dissented.
The Board’s conditional approval of the application was strongly supported by some residents of the Town and strongly opposed by others. Indeed, the Board’s decision quickly became the subject of intense discussion in the Town. Provoking further discussion and concern was the AWTHA’s decision (a) to file suit against the Board in Superior Court on July 15, 1993, (b) to appeal on the same day from the Board’s decision to the Housing Appeals Committee in the Department of Community Affairs pursuant to G.L.c. 40B, §22, 23, and (c) to file on July 16, 1993, a Housing Discrimination Complaint with the United States Department of Housing and Urban Development, Office of Fair Housing and Equal Opportunity. The last complaint alleged that the Board’s decision was
discriminatory because it limits the number of children that can live in Gay Head and limits the number of Native American children that can live on tribal trust land in Gay Head. The Board’s decision imposes conditions which are more severe than those imposed on other projects within Gay Head.
Ex. 69.
By June 25, 1993, when the Board rendered its decision, the Selectmen had not made their annual appointments for the following year. The Selectmen were facing what they viewed as knotty problems concerning the performance of the fire chief and the dog officer and decided to postpone all appointments until those problems were resolved. In any event, the decision to postpone appointments was wholly unrelated to the AWTHA’s application or any other concerns about the Board.
The legal proceedings and the controversy over the Board’s decision simmered on through the summer.[8] *332 The legal proceedings, the steps the Town should take in those proceedings and the cost to the Town of taking those steps received substantial attention during Selectmen’s meetings throughout the period. In addition, because of the controversy the Board’s decision had created, the Selectmen made no effort to tackle the question of appointments to the Board during the course of the summer and, as a result, postponed consideration of all appointments to all Town Boards. On September 23, 1993, the Town’s voters rejected an “override” of Proposition 2-1/2[9] intended to fund, among other things, defense of the Board’s decision through the appellate proceedings. On October 29, responding to what they perceived to be dominant Town sentiment, the Selectmen adopted, by a vote of two to one, the following resolution:
We the Gay Head Board of Selectmen support the application of the Wampanoag Tribal Housing Authority as submitted to the Gay Head Zoning Board of Appeals under its Comprehensive permitting authority and hereby are requesting that the permit for 30 Low Income Housing Units be granted.
On November 1, 1993, the Selectmen sent a letter to the Housing Appeals Committee containing that resolution.
At the first Selectmen’s meeting in November of 1993, the Board’s decision and the sequelae were discussed as usual. During the course of the discussion, William Sargent suggested to the Selectmen that they had been making illegal appointments to the Board for a considerable period of time. Sargent suggested that the law required appointment for five-year terms instead of appointments for one-year terms the Selectmen had in fact been making.
After the Selectmen’s meeting concluded, Walter Delaney, Chair of the Selectmen, went to a library and, for the first time, read the provisions of G.L.c. 40A, §12. Mr. Delaney concluded that Sargent’s contention had substantial merit. Accordingly, he asked Ronald Rappaport, a local attorney with considerable experience in municipal matters, for an opinion concerning whether the Selectmen had been “negligent” in the way it had gone about making its appointments to the Board over the last several years. In response, Rappaport told Mr. Delaney that the Selectmen were required to make appointments in accordance with G.L.c. 40A, §12. He expanded by saying that the statute required staggered terms and that the Selectmen ought to bring themselves into compliance with the statute by beginning anew and appointing all members of the Board to staggered terms that would expire over a three-year period. At the time he gave that advice, Mr. Rappaport was under the impression that the Board consisted of three members, not five.
Delaney reported his findings to the other two selectmen, Russell H. Smith and David E. Vanderhoop, at the next Selectmen’s meeting on November 9, 1993. Vanderhoop proposed that the Selectmen meet on the following Friday, November 12, for the purpose of considering new appointments to the Board. A meeting was scheduled for November 12 to consider that issue. The Selectmen voted to have the meeting posted, to have all current members of the Board provided with written notice, in hand, of the time and date of the meeting and to solicit applications for positions on the Board from all interested parties. Several people informed the Selectmen that one or more of the current members of the Board had other commitments and would not be able to attend the November 12 meeting but the Selectmen decided to proceed with the meeting in any event.
The November 12 meeting occured as scheduled. The primary focus of discussion centered on whether the Selectmen should remove or replace members of the Board who were in favor of a conditional permit and substitute for them individuals who were prepared to approve the AWTHA’s application unconditionally. Both at the November 9 meeting and the November 12 meeting, a number of individuals made strong statements in favor of the Selectmen’s replacement of Board members who had voted for the conditions, suggesting that if the Selectmen did not replace those individuals, the voters would replace the Selectmen. Because the Town had so few voters, the power of those who made such statements to cause the Selectmen’s removal seemed relatively clear.
At the end of the meeting, the Selectmen voted to reconstitute the Board so that the terms of the members conformed to the requirements of law and to hold another meeting, this one on November 22, 1993, for the purpose of actually considering new appointments to the Board. Before the November 22 meeting convened, the Board received ten applications for the five Board positions. Included among the applications were those of Ms. Lebovit, Mr. Stutz and Mr. Sargent. All three actually attended the November 22 meeting.
I find and conclude that one Selectman, David Vanderhoop, was firmly in favor of replacing all three. Another member, Russell Smith, was firmly in favor of retaining all three. Their views on retention or replacement reflected their respective views on the merits of the Board’s action on the AWTHA’s application. Chairman Delaney was torn but, above all, wanted to find some expeditious way to put the controversy behind the Town. He believed that the controversy was causing deep divisions within the Town, wished to avoid further divisions and wished to begin a process of reunification as promptly as possible.
I find and conclude that, at the start of November 22 meeting, Mr. Delaney had not made up his mind about whether to vote for replacement of Ms. Lebovit, Mr. Sargent and Mr. Stutz or to continue their service. I further find that, consistent with his predominant wish to end the controversy, Mr. Delaney’s paramount concern was with whether and to what extent the three were willing to compromise and show some flexibility in the position they had taken on the AWTHA’s application.
*333 Neither Mr. Delaney nor Mr. Vanderhoop intended by their vote to punish the three or to retaliate against them for their decision on the AWTHA’s application. Instead, both Mr. Delaney and Mr. Vanderhoop voted in a manner designed to effect what they believed was a proper and appropriate future result in important Town matters. In Mr. Vanderhoop’s case, the important matter was the AWTHA’s project itself. In Mr. Delaney’s case, the important matter was the controversy, division and expense the Board’s vote on the AWTHA’s application had created.
As the November 22 meeting progressed, Ms. Lebovit, Mr. Sargent and Mr. Stutz were asked if they would change their position on the conditions they had imposed on the AWTHA’s project. Ms. Lebovit and Mr. Sargent, in essence, said “no.” Mr. Stutz was more equivocal but did not say “yes.” Moreover, the dialogue between the three and the Selectmen was clearly confrontational.[10]
At the end of the meeting, the Selectmen voted, 2-1, to replace the three Board members with three others who were in favor of unconditional approval of the AWTHA’s application. Selectman Vanderhoop voted in favor because he favored the AWTHA’s project and believed that replacement of the three was the quickest way to move the project forward. Selectman Smith voted against replacement because he favored the conditions the Board had placed on the project and did not believe that those conditions should be removed without replacement by some conditions designed to buffer the Town from the project’s potential financial impact. Selectman Delaney, the Board chair and ultimate swing vote, voted for replacement of the three because, although he was concerned about the project’s financial impact, he wanted most of all an expeditious resolution of the controversy. He was concerned about the division AWTHA’s application was creating in the Town, he was concerned about the possibility that the complaint the AWTHA had filed with HUD would produce a “test” case with accompanying legal fees, he was concerned about further legal proceedings over the conditions the Board had approved and he was concerned about legal proceedings that might ensue from replacement of the three Board members. Ultimately, that constellation of concerns produced in him a belief that because lawsuits were likely no matter what he did he should accede to the wishes of the substantial majority of the Town’s voters and vote for a Board that was likely to reconsider the original vote thus promptly ending the long-running controversy over the AWTHA’s application.[11]
The Board members appointed on November 22 were appointed to terms of one, two and three years, two members each being appointed to terms of two years. Those appointments were made because the Selectmen were acting in accordance advice Mr. Rappaport gave when he was acting on the assumption that the Board consisted of three members.
On December 6, 1993, the Selectmen again considered the question of appointments to the Board and were advised by Mr. Rappaport during the course of the meeting that the actions they had taken on November 22, 1993 were consistent with state law. Later, by letter dated December 8, 1993, Mr. Rappaport modified his opinion to take account of the fact that the Board actually consisted of five members. On December 20, 1993, the Selectmen voted to adjust the terms stated on November 22 so that one of the staggered terms would expire each year. Finally, by December 13, 1993, the new Board and the AWTHA had entered into a stipulation designed to resolve the appeal pending before the Housing Appeals Committee. Ultimately, the controversy ended but this action soon followed.
CONCLUSIONS OF LAW
Against that backdrop, two broad questions of state law are presented.[12] The first is whether, upon realizing that appointments had been made improperly for more than ten years, the Selectmen had the power to take corrective action by making five appointments to staggered terms at one time. The second question is whether, if the answer to the first question is yes, the Selectmen’s action was nevertheless invalid because they made the new appointments with an eye toward how the appointees were likely to vote on a matter then pending before the Board.[13]
In my view, the answer to the first question is yes. There can be no doubt that the Selectmen’s appointment process after 1982 was wholly inconsistent with the requirements of G.L.c. 40A, §12. After 1982, the Selectmen made absolutely no effort to appoint members of the Board to specified terms or to determine whose term expired in a given year so that his or her slot could be properly filled. There was, as I have found, no purposeful effort to evade the requirements of state law. Instead, the Selectmen proceeded in blissful ignorance of what state law required. By November of 1993, the net result was a “de facto” Board sitting under color of authority although its members had not been appointed in the manner the law required.[14] See generally Attorney General v. Hutchinson, 185 Mass. 85, 88 (1904); Save the Bay Committee, Inc v. Mayor of the City of Atlanta, 181 S.E.2d 351, 360 (Ga. 1971); Grooms v. LaVale Zoning Board, 340 A.2d 385, 390-91 (Md. App. 1975); Saverino v. Zboyan, 239 N.J. Sup. 330, 341-43, 571 A.2d 327, 332-33 (N.J. Super 1990); Reddoch v. Smith, 379 S.W.2d 641, 644 (Tenn. 1964); Storm Bros. Inc. v. Town of Balcones Heights, 239 S.W.2d 842, 844 (Tx.App. 1950). Compare, e.g., Harrington v. Renner, 11 S.E.2d 838, 842 (N.C. 1952).[15]
Under those circumstances, the Selectmen’s decision to start anew with a properly staggered board, just as they had done when they discovered a similar problem in 1979, was reasonable and appropriate. Indeed, any other conclusion would have imposed on the Selectmen, and more importantly the Town, a Board composed of individuals who did not properly occupy office and whose power to act, at least after the *334 Selectmen’s discovery and recognition that they did not properly hold office, could have been open to serious legal challenges.
Defendants’ contention that the Selectmen could have and should have remedied the problem by “tracing” the seats occupied by then-current Board members back to the last proper appointees founders on the shoal of practicality. True, “tracing” is an appropriate, and perhaps the preferred, remedy when an accurate trace is possible. See generally Donovan v. Board of Labor and Industries, 225 Mass. 410, 413 (1917); Petti v. Lyons, 9 Mass.App.Ct. 558, 563 (1980). As I have found, however, it simply is not possible to engage in an accurate tracing here. Indeed, not even the evidence defendants have tendered suggests the possibility of tracing all seats back to a proper term. Defendants’ suggestions for “tracing” therefore require assignment of a group of Board members, in rather arbitrary fashion, to particular “traced” terms.[16] “Tracing” simply is not, on the present record, a viable and appropriate means for correcting the problem and thus was not a means the law required the Selectmen to employ.
Finally, defendants’ contention that G.L.c. 40A, §12 in any event permitted no more than one new appointment in 1993 is equally unavailing. That is not what the statute says. Instead, the statute says that members of the Board shall be “appointed for terms of such length and so arranged that the term of one member shall expire each year.” The statute is silent on what is to occur if a successor is not appointed at the end of a term and the member continues to sit into a succeeding year or if an appointed member is removed prematurely through the appointment, without objection, of a successor. The construction for which defendants contend would either condemn an appointing authority, and the public it served, to suffer for a lengthy period the consequences of inaction or improper action or would require the appointing authority to convene a hearing for the typically ritualistic purpose of “finding” that a member’s term had expired and that she therefore no longer had a right to serve.
To be sure, defendants are correct that the statute appears designed, at least in part, to provide the Board with a modicum of insulation from current passion. But statutes must be read as a whole and must be read so as to achieve the manifest purposes they were designed to achieve. E.g., Interstate Engineering Corp. v. Fitchburg, 367 Mass. 751, 757 (1975). It makes little sense to read c. 40A, §12 to require, in the name of dispassion, the Selectmen to perpetuate for five years the con sequences of their own maladministration through continued service by Board members who were never properly appointed.[17] Reason, common sense and a proper respect for sound operation ofTown government all suggest that a process as badly and thoroughly flawed as this one was ought to have been put right as quickly and completely as was humanly possible. Cf. Warner v. Selectmen of Amherst, 326 Mass. 435, 437 (1950).
The next question, then, is whether the Selectmen’s power to appoint an entirely new Board to staggered terms was undercut, cabined or eliminated by individual Selectmen’s motives for making the appointments they made on November 22, 1993. As I have found, Mr. Vanderhoop’s predominant motive was his desire to move the AWTHA’s project forward. Mr. Delaney’s predominant motive was his desire for an expeditious resolution of the controversy in which the Town was then embroiled.[18] I am of the opinion that neither motive invalidated the vote.
Even if one assumes complete historic regularity in the appointment process, the Selectmen would have had the power to appoint one new Board member in 1993. No one has cited any case suggesting that it would have been inappropriate for the Selectmen to make that appointment on the basis the prospective appointee’s position on reconsideration of the Board’s conditional approval of the AWTHA’s application.
The fact that an entire new Board was being appointed should make no difference. Indeed, imposition of some abstract or “pure” motive requirement on municipal authorities who select individuals to sit on a board of appeals or other Town body having quasi-judicial powers would be both unworkable and unwise. An individual’s views on a wide range of matters can, and should, be solicited and taken into account before that individual is appointed to a position of responsibility in a city or town.[19] A prospective appointee has the right to decline to answer questions about specific matters of policy or matters of voting likelihood and, although the appointing authority may take the prospective appointees’ election to do so into account in the ultimate appointment decision, surely the inquiry cannot be ruled out of bounds unless it intrudes into areas that are both irrelevant to performance of a relevant governmental function and protected by law. See generally, e.g., Brand v. Finkel, 445 U.S. 507, 518 (1980).
In that regard, the “pretext” cases defendants have cited, Commissioner of Health & Hospitals v. Civil Service Comm’n, 23 Mass.App.Ct. 410, 413 (1987), Cambridge Housing Authority v. Civil Service Comm’n, 7 Mass.App.Ct. 586, 589 (1979), are inapposite. Certainly, a governmental body cannot through fiction accomplish a result the truth would forbid. That is not what happened here. The Selectmen were not forbidden from reconstituting the Board to make it comply with state law. Instead, they were required to do so. The case thus does not involve a pretext designed to conceal impermissible action and the “pretext” cases defendants have cited do not control.
This is, in the last analysis, a case with intense local ramifications but a case that is decided narrowly. No one contends that the Selectmen intentionally subverted the appointment process so that, through a process of “correction,” they could reserve to themselves veto power over unpopular Board decisions.[20] The Selectmen’s recognition of the badly-skewed ap *335 pointment process came at a time of community upheaval over a Board decision. Although the Selectmen undoubtedly took advantage of their own errors to solve the then-current problem, they did not act for punitive or vengeful reasons. Under those circumstances, the Selectmen had the power to vote as they did.
To be sure, it seems anomalous to conclude that the Selectmen may achieve through maladministration a result that proper attention to the appointment process might have placed beyond their reach.[21] Inevitably, however, application of principle will sometimes yield anomaly. In principle, the Selectmen had the power to do what they did. The untidiness of it all reflects the disarray with which all exercises in self-government are frequently attended.
ORDER
In light of the foregoing, it is hereby ORDERED that judgment enter declaring that
1. Under the law of the Commonwealth of Massachusetts, the November 22, 1993 vote by the Gay Head Board of Selectmen appointing members of the Gay Head Board of Appeals, as that vote was amended by the Selectmen’s vote of December 20, 1993, was valid and proper.
2. Following the actions of the Gay Head Board of Selectmen on December 20,1993, the permanent members of the Gay Head Board of Appeals were Alfred Vanderhoop, Michael Hebert, Jeffrey Madison, James Vercruysse and Peter Ives.

The Pretrial order dated April 15, 1994 defined the issues for trial in the following fashion: “ 1. Pursuant to Mass.R. Civ.P. 42(b), all issues arising under G.L.c. 40A or under the common law of municipal appointments with respect to (a) the appointment and tenure of members of a Zoning Board of Appeals and (b) remedies for improper appointment of such members are severed for separate trial, without jury. The severed trial shall be referred to as Phase I.”

Now Diane Brady Emin.

Town Reports are published in Gay Head in the spring of each year and contain information pertaining to the past and future fiscal years and the past calendar year. For example, the report entitled “Annual Financial Report to the Town of Gay Head for the fiscal year ended June 30, 1984" was published in the Spring of 1985 before the 1985 annual Town meeting. The Report contains financial information for the fiscal year beginning July 1, 1983 and ending June 30, 1984, records of appointments made in the summer of 1984 and set to expire in May, 1985 and records of the activities of various Boards during the period January 1,1984throughDecember31,1984.

Ms. Brady, who had sparked the Town’s compliance with the legal requirements for zoning-board appointments, resigned her position as the Town’s executive secretary in late 1981. She was not replaced.

I base that finding on the implicit agreement of the parties. See Joint Pretrial memorandum, ¶1(26). The evidence before the court, however, shows that the actual composition of the Board on January 1, 1993, is subject to considerable doubt. At their meeting of May 22, 1989, the Selectmen reappointed to the Board of Appeals ail members save Evelyn Vanderhoop. Ex. 60, ¶9. Ms. Vanderhoop was reappointed only until May 31, 1989. Id. Apart from Ms. Vanderhoop, the Board was composed of Ms. Lebovit and Messrs. Herbert, Sargent, Alfred Vanderhoop with Ms. Jeananne Jeffers and Mr. Stutz as alternates. See Ex. 21. On July 24,1989, the Selectmen decided that Ms. Vanderhoop would hot be reappointed. The minutes of the July 24 Selectmen’s meeting, in addition to reflecting that decision, contain the following entry:
There was a motion to appoint Mr. Michael Stutz, Peter Ives and Bill Sargent as an alternate, to the Board of Appeals. The motion was interrupted by Evelyn Vanderhoop’s entrance claiming that the Selectmen could not make any appointments without advertising the position to the citizens of Gay Head for 14 days. Therefore, the motion was not acted on. Instead there was a motion to extend the Expiration dates of the alternate members until the 14 days was up.
Ex. 61, ¶4. Nevertheless, on July 31, 1989, the Selectmen appointed Messrs. Stutz and Sargent as permanent members of the Board and Ives as an alternate member. The appointment certificates were attested by Evelyn Vanderhoop. Ex.26. The Town Report for the year ending June 30, 1989, purporting to reflect all appointments with terms that were to expire in May of 1990, however, made no mention of Mr. Ives and continued to list Ms. Jeffers as an alternate member. Ex. 25. At their meeting of June 4, 1990, the Selectmen reappointed all prior office-holders to all boards with the exception of the Board of Appeals, Conservation Commission and Finance Committee. Appointments to the Board of Appeals were not made during that meeting because of Jeffrey Madison’s concerns, earlier noted, about Mr. Stutz. Ex. 27, ¶2. Ultimately, on July 9, 1990, Mr. Stutz was reappointed, Ex. 29, ¶7, but it is not clear from the minutes submitted to the court that anyone other than Mr. Stutz was appointed to the Board of Appeals thatyear. The Town Report for the year ended June 30, 1990, listing appointments with terms expiring in May of 1991, continued to list Ms. Jeffers as an alternate member and continued to make no mention of Mr. Ives. Ex. 28. At their meeting of June 17, 1991, the Selectmen simply reappointed everyone to the Board of Appeals. Ex. 64, ¶9. Again Town Report for the fiscal year ending June 30, 1991, carrying appointments expiring in May, 1992, continued to list Ms. Jeffers as an alternate and continued to make no mention of Mr. Ives. The Board of Appeals report in the Town Report for that year, however, listed both Mr. Ives and Ms. Jeffers as alternate members. Ex. 30, pp. 11, 25. Finally, at their meeting of July 6, 1992, the Selectmen made appointments for fiscal year 1993. The minutes reflect the appointment of only four permanent members, Ms. Lebovit and Messrs. Hebert, Stutz and Vanderhoop. The minutes also reflect only the appointment of Ms. Jeffers as an alternate. Ex. 66, ¶1. The Town Report for fiscal year ending June 30,1992 departed from prior custom and listed all Board members who had terms that expired the previous May. The report listed those members as Ms. Lebovit and Messrs. Sargent, Hebert, Vanderhoop and Stutz. Ms. Jeffers was listed as the alternate. The Board’s report for that year made no mention of Ms. Jeffers but again listed Mr. Ives, this time without the “alternate” designation. Ex. 31, pp. 13, 15, 28. From that confusing, to say the least, record, it surely is possible to conclude that, although Messrs. Sargent and Ives participated in the Board of Appeals hearing of central importance to this case, and although Mr. Sargent signed the decision, neither Mr. Ives nor Mr. Sargent was a member of the Board as of January 1, 1993 or any later date.

AWTHA is a public housing authority within the meaning of G.L.c. 40B, §20 et seq. It is simultaneously an Indian Housing Authority created by the Wampanoag Tribe of Gay Head, an Indian Tribe recognized under Federal law.

The controversy manifested itself in a variety of different ways. There was constant communication between members of the Board of Selectmen and various individuals in the Town concerning what should be done with respect to the HUD complaint, the appeal and the desire of many citizens to move the project forward and the desire of others to continue with the conditions the Board had placed on the project.

See St. 1980, c. 580.

Indeed, at one point Mr. Delaney stated that he intended to vote for the reappointment of Ms. Lebovit even though he had some criticism, which he detailed, concerning the way in which she had carried out some of her administrative responsibilities as the Board’s Chair. Upon hearing that, Ms. Lebovit demanded from Mr. Delaney an explanation concerning why he was prepared to vote for her reappointment if he did not think she had been doing a good job.

Mr. Delaney voiced at the November 22 hearing and at trial a number of reasons for his decision on reappointment of the three. Those reasons included Mr. Delaney’s desire to avoid having Mr. Sargent serve simultaneously on the Board, the Conservation Commission and the Martha’s Vineyard Commission and thus have the potential power to vote three times on the same project, his disenchantment with Ms. Lebovit’s statement that, if she was reappointed, she would be willing to resign as soon as the AWTHA’s administrative appeal was resolved and his belief that Mr. Stutz was exerting undue, albeit not improper, influence on the other Board members. Those reasons in fact did play a role in Mr. Delaney’s ultimate decision but were subordinate in importance to Mr. Delaney’s overall goal of ending the controversy by appointing a Board that was likely to act on the AWTHA’s application in accordance with what he perceived to be the wishes of the vast majority of the Town’s permanent residents.

As stated earlier, resolution of federal questions is to await later proceedings in a federal forum.

One can frame the second question in a variety of ways. Because I have found that the Selectmen did not cast their November 22 votes in order to penalize, or retaliate for, past conduct, the essence of the second question concerns the extent to which an appointing authority may look to a prospective appointee’s likely future behavior when making an appointment decision.

I agree with defendants that they were not “holdover” appointees, see MacBrayne u. City Council of Lowell, 241 Mass. 380, 385 (1922); Opinion of the Justices, 275 Mass. 575, 579 (1931), but for different reasons. “Holdover” status presupposes a valid appointment and continued service past the term’s end. Here the appointments were invalid. Nevertheless, the “holdover” cases are instructive. “Holdovers” ihay occupy office only until their successors are appointed. See Howard, v. State Board of Retirement, 325 Mass. 211, 213 (1950). Surely, those holding office under invalid appointments can have no greater rights and the Selectmen when dealing with them can be under no greater disabilities than in the case of “holdovers.”

The removal provisions of G.L.c. 40A, §12 therefore are inapplicable because those provisions presuppose proper occupancy of an office through a valid appointment and are not intended to enshrine mistakes.

See pp. 10-11, supra. The “tracing” proposal has two other flaws. First, it assumes 5-year terms for each Board member. Such terms, although conventional and typical, are not specifically required by G.L.C. 40A, §12 and are not the only way to insure the annual expiration of only one Board member’s term. More important, all of defendant’s “tracing” efforts begin in 1979. The 1979 Board, however, had been appointed to replace another “de facto” board sitting because of precisely the same problem. If the new beginning undertaken by the Board on November 22, 1993 was improper per se, then the new beginning in 1979 was equally improper and any appropriate “tracing” must go all the way back to 1973 when the Board was created. No one has suggested tracing that far back is possible or, if it is. The results that such tracing would produce.

One could argue that the problem facing the Selectmen when they discovered their error in November of 1993 was not a problem regarding proper appointments but was instead a problem of determining the proper termination dates of appointments properly made. If one took that view, one could then argue that the appropriate remedy for an inability to determine proper termination dates should be assignment of new termination dates, not the announcement of new appointments. Apart from its collision with the presumption of regularity attending the selectmen’s discretionary decisions, see Coleman v. Louison, 296 Mass. 210, 214 (1936), the problem with that approach is that the appointments were proper only if they were made to an “open” seat. See Attorney General v. Loomis, 225 Mass. 372,2376 (1916). Inability to “trace” accurately, however, means at the least, that one cannot tell what seats were open when appointments were made.

lhe motives of Russell Smith, the third Selectman, were, of course, no more and no less “pure” than the motives of the other two. I have found that Mr. Smith dissented from the majority vote and, in effect favored retention of all existing Board members, because he was concerned about the financial impact of the proj ect on the Town and thus favored the conditions the Board had imposed on approval of the AWTHA’s application.

Indeed, that kind of inquiry routinely is undertaken in connection with purely judicial appointments.

A very different case would be presented if the Selectmen had intentionally made improper appointments to place land mines under all Board decisions.

I say “might” advisedly because, on the present record, no one can tell what results might have flowed from conclusion of the appellate process through adjudication or settlement.